IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
July 24, 2018 Session

**NATASHA BATES v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Bradley County**
**No. 16-CR-286      Sandra Donaghy, Judge**

———————————————

**No. E2017-01613-CCA-R3-PC**

———————————————

The Petitioner, Natasha Bates, appeals the Bradley County Criminal Court's denial of her petition for post-conviction relief from her convictions of two counts of first degree felony murder and two counts of aggravated child neglect and resulting effective sentence of two consecutive life terms.  On appeal, the Petitioner contends that the trial court should have granted her motions to suppress evidence and that she received the ineffective assistance of trial counsel.  Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and J. ROSS DYER, JJ., joined.

William J. Brown, Cleveland, Tennessee, for the appellant, Natasha Bates.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Stephen Davis Crump, District Attorney General; and Brooklyn Townsend, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

On July 18, 2012, the Bradley County Grand Jury indicted the Petitioner for two counts of first degree felony murder, two counts of aggravated child neglect, four counts of initiating the process to manufacture methamphetamine, and one count of promoting the manufacture of methamphetamine.  On direct appeal of the Petitioner's convictions, this court summarized the State's proof at trial as follows:

This matter resulted from the deaths of the defendant's sons, R.B., age 3, and L.B., age 5, and the discovery of evidence of the manufacture of methamphetamine at the defendant's residence.

The State's first witness was Nicholas Glen Laney, who was employed by the Bradley County EMS and said that, on June 28, 2012, he responded to a call to the residence of Thomas Kile, the defendant's father. He found one of the victims on the sidewalk in front of the home and the other inside the front door of the residence, both unresponsive. The victims' clothes were soaked apparently with sweat; and R.B. had "warm, . . . pale . . . [a]nd moist" skin, with blue lips and nail beds. No pulse was detected for R.B., but L.B. was still breathing and had a pulse.

Dr. Jeffrey Lynn Miller testified that he was an emergency room physician at the SkyRidge Emergency Room and was the Bradley County Medical Examiner. He described the condition of R.B. when he arrived at the hospital:

> He was obtunded, he was unresponsive, you know, as where we are working on the child, you know, we are starting IV's and we are doing procedures to the child to try and determine his . . . condition. There was no response to anything we did. He was completely unresponsive.

Dr. Miller said that the standard temperature is 98.6 degrees, but R.B.'s was 109.

Dr. Miller did not believe that R.B.'s playing outside could have caused a temperature as high as R.B. had. Carol Hayes Mayo testified that she was on duty at the emergency department at Children's Hospital at Erlanger when L.B. was brought in and that his core temperature was 104 degrees.

Travis Smith testified that he was a patrol sergeant with the Bradley County Sheriff's Office and, on June 28, 2012, responded to a call regarding L.B. and R.B. He said that the EMS technicians already were at the scene and working on the two victims. One was in an ambulance, and the other was being brought out of the house. Initially, he thought it was a drowning call, but the defendant said the incident had occurred on Keith Valley Road. She said she had not called 911 from that location because she did not have a cell phone and had to go to her father's house.

Charles Dewayne Scoggins testified that he was a criminal investigator for the Bradley County Sheriff's Office and responded to the call at 2:44 p.m. to 851 Armstrong Road and immediately went from there to 879 Keith Valley Road, where the defendant was living. At that location, he examined the Slip and Slide and explained its condition:

What I noticed initially when I got there the slide appeared to be relatively dry with the exception of two very small puddles, all of which had dirt and bugs in it. The ground around the Slip and Slide was dry, there was no wet grass anywhere that I could find, and over all in general the Slip and Slide did not appear to have been used in the recent past.

He first spoke with the defendant at the SkyRidge Medical Center Emergency Room, and she said the victims had been outside, playing on the Slip and Slide and when she returned from the house, they were in the front yard and unresponsive. Because of the "suspicious circumstance" of the incident, he asked, and the defendant consented, to having a blood sample taken from her while still at the emergency room. The defendant returned with him to her residence, and later they went together to the Bradley County Sheriff's Office. She said that she had gone inside her home, while the victims remained outside in the yard, and when she returned twenty to twenty-five minutes later, she found them. She said that she had fixed the victims eggs for breakfast, but Investigator Scoggins found no evidence that eggs had been cooked that morning. Later, she said that she had been inside for thirty to forty-five minutes. He asked her the whereabouts of her cell phone, and she responded she thought it was in her car, which was then in the possession of the sheriff's department. He said that he examined her cell phone and found that it would "ring straight through to the Bradley County 911 Center." The defendant did not explain why her phone had been found in the trunk of her car.

When Investigator Scoggins told the defendant of the autopsy findings, she responded that the information she had previously given was accurate, although it was possible that the victims had been under the front porch instead of in the yard. Later, she said she had found the victims in her car:

When we were getting close to being finished she did finally admit that she in fact had come out and found both children inside of her car, describing her younger child [R.B.] to be in the front right passenger seat of the vehicle with that seat laid completely back, and that her old[er] son [L.B.] was partially hanging out of the right rear passenger door.

Two search warrants were executed at the defendant's residence. The first, on July 3, 2012, was to conduct a temperature study to determine the maximum temperature in the defendant's car, where she said she had found the children. The next search warrant, executed "approximately two weeks later," was to search for the manufacture of methamphetamine. Regarding the temperature experiment, Investigator Scoggins said that the temperature on June 28, 2012, was 101 degrees, and on July 3, when they conducted the experiment, it was less than that. The car was parked in the same location as on June 28, and the purpose of the experiment was to measure the outside temperature and that at different locations in the car, using seven or eight thermometers. Every thirty minutes, each thermometer was read for the temperature shown and was photographed. The conditions on the day of the test were the same as on June 28, except for the lower outside temperature. At 1:00 p.m. on the day of the test, the ambient air temperature inside the car was 129 degrees.

Investigator Scoggins testified that the defendant told him she had a date with Mike Mauradian the night of June 27 and was with him from 4:30 or 5:30 p.m. until about 10:00 p.m., when she left to go home. However, after officers asked to search her cell phone, she recalled that later she had gone to the residence of Preston Woods. Describing the layout of the interior of the defendant's vehicle, he said that the back passenger door "was obstructed based on the front seat being leaned back very far and two car seats piled up right behind it, you couldn't get between the seat and the car seats. It would have been hard to get through there." He said that, of the four doors of the vehicle, "the only door that opened from the inside was the right rear which was blocked by the two car seats."

Melanie Carlisle testified that she was employed by the Tennessee Bureau of Investigation ("TBI") as a special agent forensic scientist in the field of toxicology and blood alcohol. She said that her testing of the defendant's blood showed "amphetamine at less than .05 micrograms per milliliter, and methamphetamine at less than .05 micrograms per milliliter."

She said that, following a methamphetamine "high," a user would reach a "crash stage" and become depressed and sleepy.

Monica Datz testified that she was a crime scene investigator and latent print examiner with the Bradley County Sheriff's Office. She examined the defendant's vehicle and described the condition of the doors:

> The front driver door, the exterior handle was broken but the door can be opened from the exterior by putting my hand in the hole and searching for and pulling, and I actually had to have one of our garage employees show me how to do it. I couldn't get the door open myself but I was able to pull on a mechanism inside there and open the door. And the interior handle on the driver door is broken, but it can be opened by pulling forward on a little piece that was still there, and I had to pull forward to open that.

As for the front passenger door, she said that ["]the exterior handle is missing, there's a hole in this area. I pulled on a bar in the hole and it locked and unlocked all the doors, but the door would not open for me." She added that the interior handle of the front passenger door was broken off as well, and she could not open this door from the inside. The exterior handle of the back driver door worked "properly," but the interior handle was missing and she could not open the door from the inside. She said that the defendant's cell phone was in the trunk of the vehicle.

Jan Null testified that he was a meteorologist in Saratoga, California, and since 2001, he had been studying when outside temperatures were between 72 and 96 degrees. He described the effect of the sun's heating the interior of a vehicle:

> A car basically acts as a greenhouse. The sun's energy comes in what is short wave energy, very high energy. It doesn't heat up the air very much but heats up objects inside a vehicle. It's not uncommon for seats and dashboards to be 200 degrees. That in turn gives off heat that warms the air inside of a car, the same sort of radiant heat you would have from that . . . little glowing heater you have under your desk for those cold window [sic] mornings. That's heating up the car. Well, a car is a closed area and so that heat continues to rise, and it actually heats up very rapidly. In the first 10

minutes a car heats up about 19 degrees above whatever the outside air temperature. After a half an hour it's 34 degrees above whatever the outside air temperature is, and in an hour it's 40 degrees plus above whatever the outside air temperature is.

Mr. Null added that, at about one hour, the interior temperature of a vehicle reached a plateau of about 45 degrees more than the outside temperature. He had reviewed temperature records, and the June 28 temperature at the Cleveland water treatment plant was 101 degrees. He explained how the interior temperature of a car would rise as the outside became warmer:

It would have heated up to, let's say what that 85 degree temperature, during that first hour it would have gotten to 125 or so, and then gradually as the day warmed up, as the day warmed from that 85 to 101 the temperature inside the car, again that plateau would have been reached and it would have stayed up at that range.

Mr. Null said leaving the windows of a vehicle partly open made little difference of the interior vehicle: "It mattered very little as far as windows being cracked. I have looked at a number of days where they were cracked and it made a difference of about two or three degrees on the extreme end of the temperatures."

Dr. Steven Cogswell testified that he was the deputy chief medical examiner at the Regional Forensic Center in Knoxville. He described the effect on the human body as its temperature rises:

Well, at a 109 degrees he will be comatose and probably die. Above a 108 we start seeing brain damage, irreversible brain damage. Above 104 we start seeing reversible kind of changes, the ones that I've already gone over. But when you get to about, roughly a 105 or 106 or so coma starts setting in because you are simply unable to maintain conscientiousness [sic]. Your brain is not getting enough blood. What blood it is getting doesn't have much oxygen, you are not moving it very well, and basically your body begins this process of shutting down. Ultimately that leads to death. At a 109 degree core temperature though you

- 6 -

> would be expected to be in [a] coma if not death [sic] by that point.

State. v. Natasha Moses Bates, No. E2014-00725-CCA-R3-CD, 2015 WL 1593657, at *1-4 (Tenn. Crim. App. at Knoxville, Apr. 7, 2015), perm. app. denied, (Tenn. Aug. 13, 2015).

In addition to the evidence described above, our review of the trial transcript shows that Patrick Vasterling of the Department of Children's Services (DCS) testified that on June 28, 2012, he spoke with the Petitioner at SkyRidge Hospital, that she consented to a urine test, and that a ten-panel drug screen of her urine was positive for methamphetamine. Investigator Scoggins testified that during a search of the Petitioner's home on July 13, 2012, officers found items used to manufacture methamphetamine in the Petitioner's garage and in a dumpster near the garage. Lieutenant John Stone of the Bradley County Sheriff's Department's Narcotics Unit testified that he was familiar with the "one pot method" for manufacturing methamphetamine and that items found in the Petitioner's home and dumpster were consistent with the production and use of methamphetamine.

Detective Heath Arthur of the Bradley County Sheriff's Department testified that he had worked on at least 200 cases involving methamphetamine laboratories, that he was familiar with the "one pot method" for cooking methamphetamine, and that he helped execute the search warrant for the Petitioner's home on July 13. During the search, officers found plastic "shaker" bottles. Detective Arthur said that although the fluid in a shaker bottle could "eat through" the bottle in two to three weeks, he did not see any signs of bottle deterioration in this case. On cross-examination, Detective Arthur testified that the rate of deterioration depended on the consistency of the contents in the bottle and that "I'm [no] expert on it, I'm going by what was stated to me from a meth cook that I recovered a meth lab from."

James Michael Derry of the Tennessee Meth and Pharmaceutical Task Force testified that he was certified to operate an ion scan machine and that the machine could detect methamphetamine residue on surfaces. He testified as an expert in the operation of the ion scanner that he "tested [swabs] right on the spot as they were collected" in the Petitioner's home. The ion scanner detected "a pretty substantial hit" of methamphetamine on a swab collected from a piece of aluminum foil in the Petitioner's garage.

The Petitioner's mother, aunt, grandmother, and father testified on her behalf. Id. at *4-5. The Petitioner testified that on the day of the victims' deaths, they were playing outside while she was cleaning inside her home. She noticed she had not heard them

playing for a while, went outside to check on them, and found them lying in the yard. See id. at *5. The Petitioner said she kept a marijuana pipe and a methamphetamine pipe in the garage but denied knowledge of materials for making methamphetamine or providing a place to "'cook'" methamphetamine. Id. On cross-examination, the Petitioner maintained that she found the victims "[u]p toward the front yard past the Slip and Slide." She "panicked," put the victims in her car, and drove them to her father's house.

On August, 29, 2013, a Bradley County Criminal Court Jury convicted the Petitioner as charged of two counts of first degree felony murder and two counts of aggravated child neglect, a Class A felony. The jury convicted the Petitioner of four counts of facilitation to initiate the process to manufacture methamphetamine, a Class C felony, as a lesser-included offense of initiating the process to manufacture methamphetamine. The jury acquitted the Petitioner of the one count of promoting the manufacture of methamphetamine.

After a sentencing hearing, the trial court sentenced the Petitioner to consecutive life sentences for the felony murder convictions. The court sentenced her to twenty years for each conviction of aggravated child neglect and ordered that she serve the sentences consecutively to each other but concurrently with the life sentences. The court sentenced her to three years for each facilitation conviction and ordered that she serve the three-year sentences concurrently with all counts.

On appeal of her convictions to this court, the Petitioner claimed that the evidence was insufficient to support the convictions, that the trial court erred by not severing the charges of initiating the process to manufacture methamphetamine from the remaining charges, and that the trial court erred by ordering consecutive sentencing. Id. at *1. This court found that the evidence was sufficient to support the convictions but that the trial court erred by not severing the drug offenses from the murder and aggravated child neglect offenses. Id. This court reversed the four convictions of facilitation to initiate the process to manufacture methamphetamine and remanded the case to the trial court for a new trial as to those counts. Id. This court affirmed the convictions of felony murder and aggravated child neglect and the sentences for those convictions, including consecutive sentencing for the murder convictions. Id. On remand, the State chose not to retry the Petitioner for the drug offenses and dismissed the charges.

After our supreme court denied the Petitioner's application for permission to appeal, she filed a timely pro se petition for post-conviction relief, alleging, in pertinent part, that she received the ineffective assistance of trial counsel. The post-conviction court appointed counsel for the Petitioner, and post-conviction counsel filed an amended petition. Relevant to this appeal, post-conviction counsel alleged that (1) the July 13

search of the Petitioner's home was illegal because the affidavit used to obtain the search warrant did not establish probable cause; (2) the temperature experiments conducted on the Petitioner's car exceeded the scope of the July 3 search warrant for the car and, therefore, violated the Petitioner's Fourth Amendment rights; and (3) she received the ineffective assistance of trial counsel. Regarding the latter claim, the Petitioner alleged that trial counsel was ineffective because he should have filed motions to suppress evidence seized pursuant to the illegal searches of her home and car; failed to pursue pretrial motions in limine related to evidence obtained from the ion scanner and her urine test; failed to object to the testimony of Investigator Scoggins, Agent Carlisle, Lieutenant Stone, Detective Arthur, James Derry, and Patrick Vasterling; and questioned her in such a manner on direct examination as to suggest to the jury that he did not think she was a credible witness.

Relevant to this appeal, attorney Robin Flores testified at the post-conviction evidentiary hearing that he had been practicing law since 2000 and that he was licensed in Tennessee and Georgia. His law practice focused on civil rights litigation, criminal defense, and family law, and he estimated that he had worked on hundreds of criminal cases. He said that he had tried more than fifteen criminal cases, including five murder cases, but that he had represented less than six petitioners in post-conviction cases.

Over the State's objection, the post-conviction court allowed Flores to testify as an expert in criminal defense that he reviewed the Petitioner's trial record and that the State's theory of the case was that "we had a meth addled mother [who] was more interested in her drug activity than paying attention to the children." Flores said that trial counsel filed a pretrial motion in limine to suppress the results of the Petitioner's urine test, which was positive for both methamphetamine and marijuana, but that trial counsel abandoned the motion. Flores stated that trial counsel should have challenged the reliability of the urine test because it was administered by a DCS employee "who did just a test strip that could be read any number of ways." Moreover, the Tennessee Bureau of Investigation already had conducted a blood test on the Petitioner. Therefore, the urine test "just added" to the State's theory of the case.

Flores testified that trial counsel also filed a pretrial Daubert motion regarding the evidence obtained from the ion scanner but failed to pursue the motion. He said that the results of the ion scan supported the State's theory that methamphetamine was manufactured in the Petitioner's home and that trial counsel had no reason to abandon the motion. Trial counsel filed a similar pretrial motion regarding the temperature study on the Petitioner's car. Flores said trial counsel never argued the motion, which "would have hit the heart of the State's case, as far as the mechanism of death."

Flores testified that he reviewed the search warrants for the Petitioner's car and home. He described the Petitioner's car as "the weapon" and "the instrumentality of death." He noted that this court's direct appeal opinion referred to the temperature study as an "experiment." Flores said the search warrant for the car did not authorize an experiment on the vehicle or the movement of the vehicle back to the Petitioner's home for the experiment. Therefore, trial counsel should have filed a motion to suppress the evidence obtained from the experiment. Regarding the search warrant for the Petitioner's home, the affidavit in support of the warrant contained information from informants who claimed to have seen the Petitioner using drugs in her residence. However, the information was "stale" because the incidents reported by the informants occurred almost two weeks before the affidavit was presented to obtain the warrant. Moreover, because the informants used the drugs with the Petitioner, they were part of the "criminal milieu," and the affidavit should have satisfied the Jacumin and Aguilar-Spinelli standards for establishing their credibility and reliability.

Flores testified that he reviewed James Derry's trial testimony about the ion scanner and that trial counsel made "little, if any" challenge to Derry's qualifications to testify about the results obtained from the scanner. Flores said that a challenge to Derry's qualifications would have been appropriate because Derry's testimony "put to a Jury that there was this ongoing methamphetamine production going [on in] the residence." Trial counsel should have objected to Derry's testimony about the ion scan and pursued the motion in limine he filed regarding the evidence obtained from the scan.

Flores testified that trial counsel should have challenged Patrick Vasterling's qualifications to administer the Petitioner's urine test and Investigator Scoggins' qualifications to conduct the temperature experiment on the Petitioner's car and report the experiment's results. Furthermore, although Investigator Scoggins testified that he did not work in narcotics, he was allowed to testify about the importance of Coleman fuel and Drano in the process of manufacturing methamphetamine. Flores said Agent Carlisle also was allowed to testify "in fields of expertise" in which she was not qualified. Specifically, Agent Carlisle testified that a person "crashing" after being "high" on methamphetamine would be sleepy. Flores said Agent Carlisle's testimony was important to the State's theory that the Petitioner was "a meth mom."

Flores stated that Lieutenant Stone testified "very broadly in generalities about things that he didn't observe at the scene." Lieutenant Stone also gave a "broad" opinion as to how methamphetamine laboratories were created and how people participated in the laboratories. Lieutenant Stone's testimony was prejudicial to the Petitioner because "again, it piled on the State's case that this is a meth mom." Moreover, at sentencing, the trial court used the repetitious trial testimony about a methamphetamine laboratory being in the home to find that the victims were living in "horrible conditions." Detective

Arthur testified at trial that he obtained his information from a "meth cook." However, trial counsel did not challenge Detective Arthur's hearsay testimony. Flores said Detective Arthur's trial testimony was prejudicial because it was "a piling on . . . about meth labs in general."

Finally, Flores testified that he reviewed trial counsel's direct examination of the Petitioner and that "it looks almost as if he was challenging his own witness." Flores said trial counsel appeared to be the Petitioner's adversary rather than her advocate, which "signal[ed]" to the jury that it should not believe the Petitioner. Flores said that in his opinion, the Petitioner received the ineffective assistance of trial counsel.

On cross-examination, Flores testified that this was his first time testifying as a criminal defense expert in a post-conviction case and that he was not being paid for his testimony. He acknowledged that he represented a defendant named Jason Rogers and that the trial court later found him to have rendered the ineffective assistance of counsel in Rogers's case.

Flores testified that he spent about six hours reviewing the Petitioner's trial record. He did not interview any witnesses who testified at trial, did not review any discovery filed in the case, and did not interview trial counsel. Regarding the search warrant for the Petitioner's home, Flores acknowledged that Jacumin was later overturned and that the new standard was "bad" for defendants. He said, though, that Jacumin was in effect when the affidavit to obtain the search warrant for the Petitioner's home was submitted. He acknowledged that trial counsel never challenged the legality of the search warrant in this case and that, if addressed by the post-conviction court, the post-conviction court would have to look at the legality of the warrant under the new standard.

Regarding the temperature experiment conducted on the Petitioner's car, Flores testified that "[t]here was a reference to [the experiment] toward the end of the affidavit" in support of the search warrant but that the search warrant itself did not authorize any experiment or test on the vehicle. The search warrant also did not authorize any movement of the vehicle.

Flores acknowledged that defense counsel cross-examined the State's witnesses and filed a motion for a bill of particulars, which was denied by the trial court. Trial counsel also filed a motion to sever the offenses and raised the issue on appeal, and this court agreed with trial counsel.

On redirect examination, Flores testified that even though trial counsel cross-examined the State's witnesses, suppression of the evidence would have been the best trial strategy so that the jury did not hear about the evidence. Flores said that in his

opinion, trial counsel's failure to pursue the motion in limine regarding the ion scanner was not a legitimate trial strategy. He noted that trial counsel alleged in the Petitioner's motion for new trial that the trial court erred by allowing the State to introduce the ion scanner results into evidence. He also noted that during the hearing on the motion for new trial, the trial court said it waited for trial counsel to object to the ion scan evidence during the trial but that counsel never did so. Flores stated, "That tells me that the trial Court would have granted that [motion]."

The Petitioner testified that trial counsel never talked with her about filing motions to suppress the searches of her home or car and never talked with her about the motions in limine he filed regarding her urine test and the ion scanner. The Petitioner and trial counsel talked "a little bit" about her trial testimony. However, trial counsel never told her that he was going to use her direct examination testimony to suggest she was lying. Post-conviction counsel asked if the Petitioner was comfortable with trial counsel's questions to her during direct examination, and she said no.

On cross-examination, the Petitioner acknowledged that trial counsel talked with her about how difficult the State's cross-examination was going to be. She also acknowledged that trial counsel talked with her about preparing for the State's cross-examination and that trial counsel told her the jury "needed to hear everything from her." The Petitioner said, though, that she did not know trial counsel was going to "jump all over [her]" on direct examination. The Petitioner acknowledged that she and trial counsel discussed the ion scanner and that he gave her discovery materials.

Trial counsel testified that he became licensed to practice law in 1989 and that he had been working for the public defender's office since that time. He said he had served as lead counsel in ten to twelve murder cases and had assisted other attorneys in an additional twelve murder cases. The public defender's office was appointed to represent the Petitioner, and trial counsel served as lead counsel. A second attorney served as assistant counsel and met with the Petitioner in jail "almost on a weekly basis." Trial counsel also met with her but not as often as assistant counsel.

Trial counsel testified that he considered the Petitioner's case to be a "major" case. When trial counsel began representing the Petitioner, the State's investigation was ongoing. The State provided open file discovery to trial counsel, and trial counsel reviewed discovery as the investigation continued. He said that he filed a motion for a bill of particulars and a motion to sever the drug offenses and that the motion to sever "in some ways acted as a suppression motion." During the hearing on the motion to sever, trial counsel raised the issue of stale information and access others had to the dumpster, which was part of his strategy. However, the trial court denied the motion.

- 12 -

Trial counsel testified that as part of his investigation, he went to the Petitioner's home. He also met with her mother, grandmother, and aunt to find out what they knew about the case. Trial counsel said that his trial strategy was to mitigate the State's evidence as much as he could. For example, trial counsel presented proof that the Petitioner's mother owned the Petitioner's mobile home and garage. The Petitioner had lived there only a short time before the victims died, and other people had access to the property.

Trial counsel testified that he reviewed the search warrants for the Petitioner's car and home. Regarding the search warrant for the car, which was executed on July 3, 2012, trial counsel did not think there was a basis for a motion to suppress based upon a lack of probable cause. Trial counsel also did not consider the temperature study inside the car to be an "experiment" or scientific evidence. During the study, police officers photographed the car and recorded the temperature by the hour. Trial counsel said he did not think that the sheriff's department needed a separate search warrant simply to monitor the temperature inside the car or that monitoring the temperature violated the Fourth Amendment. Regarding the search warrant for the home, which was executed on July 13, 2012, trial counsel said that the affidavit and search warrant were "kind of a typical boiler plate search warrant and affidavit that you see" and that he did not think a motion to suppress would have been successful. The search warrant for the home was executed about ten days after the victims died and was obtained based on information provided by "some associates" of the Petitioner. The associates corroborated each other, and trial counsel did not think their information was stale.

Trial counsel testified that assistant counsel talked with James Derry before trial about Derry's qualifications to use the ion scanner. At trial, trial counsel did not object to Derry's testifying as an expert. Trial counsel had "very limited knowledge" about ion scanners but knew data collected from them "wasn't exactly cutting edge" and had been admitted into evidence in federal cases. He said he thought the ion scan met the <u>Daubert</u> test and that he did not object to Derry's testimony about the scan results. Even though one of Derry's samples was positive for methamphetamine, trial counsel knew from his research that methamphetamine particles "remain months, even years later." Therefore, trial counsel thought he could show during Derry's cross-examination that the methamphetamine residue could have been in the Petitioner's home for months or years before she lived there. Regardless, even if the jury had not heard Derry testify about the ion scan results, the jury would have heard that police officers found evidence of a methamphetamine laboratory in garbage in her home and dumpster. Methamphetamine also was in the Petitioner's blood, and trial counsel "didn't see any way around the admissibility of that blood test result." Accordingly, "meth was gonna be a part of the case." That said, trial counsel "tried to remove [the Petitioner] as far as [he] could from any active manufacture of methamphetamine" and show through his cross-examination of

the State's witnesses that the Petitioner used methamphetamine but was not actively involved in manufacturing methamphetamine.

Trial counsel testified that the Petitioner consented to her urine test, which was positive for methamphetamine and marijuana. The Petitioner also consented to a blood test, which showed methamphetamine in her system. Trial counsel filed a motion in limine to exclude the urine test, but he did not know of a way to keep the blood test from the jury. Therefore, he entered into an agreement with the State in which the State agreed not to reveal to the jury that the Petitioner's urine was positive for both methamphetamine and marijuana. At trial, Patrick Vasterling testified for the State that the Petitioner's urine was positive for methamphetamine. However, he did not testify that her urine was positive for marijuana.

Trial counsel acknowledged that he did not object to Agent Carlisle's qualifications or her direct testimony that crashing after a high on methamphetamine would make a person sleepy. During her cross-examination, though, trial counsel pointed out to the jury that the amount of methamphetamine in the Petitioner's system was low. Trial counsel also cross-examined Agent Carlisle "quite a bit" to show that the Petitioner was not using methamphetamine at the time of the victims' deaths. Similarly, trial counsel cross-examined Investigator Scoggins about the Petitioner's demeanor at the hospital, and Investigator Scoggins testified that he did not think the Petitioner was under the influence of methamphetamine. Trial counsel said that although Investigator Scoggins was not an expert on the manufacture of methamphetamine, other officers who testified for the State could have qualified as experts. Therefore, even if trial counsel had objected to Investigator Scoggins's testimony about manufacturing methamphetamine, the State had "other ammunition." Regarding Detective Arthur, trial counsel did not try to exclude his testimony about finding items used to manufacture methamphetamine in the Petitioner's home. Nevertheless, trial counsel thought he could do a "good job" of mitigating Detective Arthur's testimony by showing that the State could not link the manufacture of methamphetamine to the Petitioner at the time of the victims' deaths. Trial counsel argued to the jury that the items did not belong to the Petitioner and could have been in the home for a month before the victims died.

Trial counsel testified that the Petitioner was going to claim at trial that she found the victims in the yard. However, the evidence did not support her claim. Trial counsel said that he and the Petitioner had "numerous conversations about her version of the events," that he was concerned her version could not be corroborated by the evidence, and that he "thought there was gonna be serious consequences" if the jury thought she was lying. Regarding the tone and adversarial nature of his direct examination of the Petitioner, he stated,

[M]aybe I was too hard on her. I thought I needed to be able to get her to show some real emotion, and I thought, maybe she would have a different version in front of the Jury as to what happened. I know what she told me. I know what I anticipated her testimony to be. But I was concerned [that] the testimony was gonna be I found them in the yard.

On cross-examination, trial counsel testified that he filed a motion to sever the drug offenses and "won" that issue on appeal. Trial counsel argued to this court that the severance error entitled the Petitioner to a new trial on all of the charges, not just the drug charges, but this court ordered a new trial only on the drug charges. Trial counsel reviewed the search warrants for the Petitioner's car and home and determined that motions to suppress would not be successful. Therefore, his strategy was to focus on the short amount of time the Petitioner was in the home and access to the home by other people. Regarding the affidavit for the search of the home, the information given to the police by the Petitioner's associates predated the victims' deaths by just a couple of days. Accordingly, the information was not stale. In addition, the associates were not "criminal informants." Trial counsel acknowledged that the police applied for the search warrant fourteen days after the victims died. Trial counsel maintained that he thought he could mitigate the evidence found during the search of the home because the Petitioner had lived there just a couple of weeks.

Trial counsel noted that the affidavit in support of the search warrant for the home requested to use an ion scanner during the search. Although trial counsel filed a motion in limine to exclude the ion scan results, he found cases in which ion scan results had been admitted into evidence. During a pretrial hearing, the trial court stated that it would determine the admissibility of the results during the trial. Trial counsel never raised the issue at trial but raised the issue in his motion for new trial. At the hearing on the motion for new trial, the trial court considered the issue waived. Trial counsel explained, "[M]y thinking, right or wrong, my tactic was to mitigate her involvement with [the manufacture of methamphetamine] because she hadn't lived there for a long period of time." He acknowledged, though, that if the trial court had granted his motion in limine, it would have affected the State's ability to prove the manufacture of methamphetamine in the residence.

Regarding the search warrant for the Petitioner's car, trial counsel testified that he was not aware of United States v. Jones, 565 U.S. 400 (2012). He said he thought probable cause existed to issue the search warrant because the State had evidence the victims died of heat exhaustion in the car. Therefore, the car was the instrumentality of the crime, and the police could return the car to the crime scene to conduct the temperature study. Trial counsel stated that although the movement of the car and the temperature study were not mentioned in the search warrant, he did not think the police

- 15 -

were required to obtain a warrant "to simply do [a] heat study on the inside of the vehicle, that they already, lawfully had in their possession." He then stated, "There was no search." Regardless, even if a motion to suppress the temperature study had been successful, nothing precluded the State from obtaining a new search warrant and conducting the temperature study again. Trial counsel acknowledged that Jan Null testified as an expert for the State based on the temperature study but said that "we all know [without Null's testimony] cars heat up during the day if they're left out in the sun." He acknowledged that the temperature study helped the State's case.

Trial counsel acknowledged that during Investigator Scoggins' trial testimony, Investigator Scoggins told the State that he was not qualified to testify about the manufacture of methamphetamine. Nevertheless, the State continued to examine him about the subject. Trial counsel said he did not object to Investigator Scoggins's continued testimony about the manufacture of methamphetamine because his trial strategy was to show that the State could not prove the Petitioner was involved in manufacturing the drug when the victims died. In any event, even if trial counsel had successfully excluded Investigator Scoggins's testimony, the State had other witnesses who could testify about methamphetamine production. Trial counsel also did not object to Detective Arthur's testimony from a "meth cook." Trial counsel reiterated that his trial strategy was to mitigate the State's proof and said that he not object to Detective Arthur's testimony because he thought the evidence "was coming in anyway." Trial counsel acknowledged that he allowed Agent Carlisle to testify about the effects of methamphetamine on a person's body and that he should have objected to her testimony.

Regarding trial counsel's direct examination of the Petitioner, trial counsel explained as follows:

I don't remember ever accusing her of being a liar. I'm asking her difficult questions about inconsistencies in her statements, and what I believe to be inconsistencies with the crime scene. . . . The same questions a Jury was gonna have. I absolutely thought the Jury was gonna have some serious questions about the condition of that house, that that could affect their decision on this, the bad conditions of the house. I couldn't -- I couldn't -- you've talked about me ignoring evidence and not filing motions. I wasn't gonna ignore that. She had to explain it. I confronted her with it. I thought she answered it fine.

In the beginning of the direct I thought she showed some good emotion, real emotion, a mother who had lost two children. That was my tactic, to get heartfelt emotion from her. I thought that was important in

- 16 -

this case. These were two small children. She was the mother. They died in her care.

In a written order, the post-conviction court denied the petition for post-conviction relief. The court found Robin Flores and trial counsel to be credible witnesses. The trial court also found the Petitioner credible but stated that "her ability to remember was poor and her testimony lacked specificity." Turning to the issues raised, the post-conviction court found that trial counsel "probably" should have filed a motion to suppress the methamphetamine and ion scanner evidence obtained pursuant to the July 13 search warrant for the Petitioner's home. The trial court noted that while trial counsel's strategy was to "distance" the Petitioner from the State's evidence, the better strategy would have been for the jury not to have heard about the methamphetamine and ion scanner evidence at all. The court found, though, that even if trial counsel had filed a motion to suppress and the trial court had granted the motion, the jury still would have heard about other "meth-related" evidence, such as the Petitioner's blood test and text messages in her cellular telephone that linked her to drug use. Thus, the court found that the Petitioner failed to demonstrate prejudice.

The post-conviction court also found that trial counsel "probably" should have filed a motion to suppress the temperature study conducted on the Petitioner's car because the study was outside the scope of the July 3 search warrant. That said, the post-conviction court found that the temperature study was "an observation over time," not a "search," and, therefore, that a search warrant for the temperature study was not required. The court found that two cases relied on by the Petitioner, United States v. Jones, 565 U.S. 400 (2012), and State v. Meeks, 876 S.W. 121 (Tenn. Crim. App. 1993), were "readily distinguishable from the observations or measurements made on an item of evidence in police custody."

Finally, the post-conviction court addressed the Petitioner's claim that trial counsel was ineffective during his direct examination of her at trial. The court found that trial counsel's "'accusatorial'" style of questioning the Petitioner "[fell] under the umbrella of 'trial tactics' made in the heat of battle." Thus, the post-conviction court denied the Petition for post-conviction relief.

## II. Analysis

On appeal, the Petitioner contends that the post-conviction court should have granted her post-conviction relief on her "stand alone" claims that the searches of her car and home violated her Fourth Amendment rights. Regarding the search of her car, she asserts that the movement of the car from the sheriff's department back to her residence and the subsequent temperature study exceeded the scope of the search warrant.

Regarding the search of her home, she argues that the affidavit in support of the search warrant did not establish that items related to the manufacture of methamphetamine would be present in her home on the date of the search. The Petitioner also contends that she received the ineffective assistance of counsel. Specifically, she contends that trial counsel was ineffective because he failed to file motions to suppress the evidence found during the searches of her home and car; failed to pursue motions in limine regarding the ion scan and urine test; failed to object to the testimony of Investigator Scoggins, Detective Arthur, Agent Carlisle, James Derry, and Patrick Vasterling; and questioned her so harshly that he suggested to the jury she was lying. The State argues that the post-conviction court properly denied the petition for post-conviction relief. We agree with the State.

Initially, we note that the State argues for the first time in a footnote of its brief that the Petitioner's stand-alone claims regarding the searches of her car and home are not properly before this court because she could have raised them at trial. See Tenn. Code Ann. § 40-30-106(g). The Petitioner responds that the State has waived this defense because the State failed to raise it in the State's written response to the petition for post-conviction relief or at the evidentiary hearing. See State v. Walsh, 166 S.W.3d 641, 646 (Tenn. 2005) (concluding that because State did not assert the defense of waiver at the post-conviction hearing, "the State's waiver argument has itself been waived"). However, "when suppression of evidence seized pursuant to a search warrant is advocated, the burden is upon the accused to prove by a preponderance of the evidence . . . the existence of a constitutional or statutory defect in the search warrant or the search conducted pursuant to the warrant. State v. Henning, 975 S.W.2d 290, 298 (Tenn. 1998). The Petitioner did not present any testimony at the evidentiary hearing regarding the affidavits filed in support of the search warrants or the legality of the warrants. Although Robin Flores testified about the affidavits and search warrants, he did so in the context of ineffective assistance of counsel. Moreover, the post-conviction court did not address the search warrants as independent claims for relief but instead considered them solely as grounds for ineffective assistance of counsel. The Petitioner does not assert that we should remand the case to the post-conviction court and direct that court to rule on his stand-alone claims regarding the search warrants. Thus, like the post-conviction court, we will address those claims only within the context of ineffective assistance of counsel.

To be successful in a claim for post-conviction relief, a petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded

their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Further,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

A.  Car Search Warrant

The Petitioner claims that trial counsel was ineffective for failing to file a motion to suppress the temperature study conducted on her car because the movement of the car from the sheriff's department to her residence and the temperature study exceeded the scope of the warrant. The State argues that counsel was not ineffective for failing to file a motion to suppress. We agree with the State.

On July 2, 2012, Detective Kevin White of the Bradley County Sheriff's Department submitted an affidavit in support of a search warrant for the Petitioner's car. The affidavit stated that the car was being stored at the sheriff's department and that probable cause existed to believe the car "will contain evidence, contraband, fruits, instrumentalities or other items criminally possessed or tends to demonstrate that said person(s) participated in the commission of violations of [Tennessee Code Annotated section] 39-15-402 Aggravated Child Abuse and Child Neglect or Endangerment." The affidavit then listed eight paragraphs in support of probable cause. The eighth paragraph addressed the proposed temperature study and stated as follows:

A consent search was conducted on the vehicle to be searched on 6-29-12. At the time of this search several facts were not known. Items that would show the whereabouts of [the Petitioner] such as paperwork, receipts and other documents were not examined because of the information provided at that time. Additionally, temperatures inside of the automobile were not recorded due to the information at the time being provided by the mother [the Petitioner]. Now that it is known the children likely died in a confined space, this automobile needs to be examined for conditions and temperatures as well as any item that would show the whereabouts of [the Petitioner]. For the purposes of the examination of the conditions inside the vehicle during heated conditions, the vehicle will need to be transported back to the residence where the incident is alleged to have occurred to create similar conditions to document the temperature inside of the vehicle.

A search warrant was issued on July 2, 2012, and authorized law enforcement "to make a forthwith search of the 1995 Green Toyota Corolla bearing Tennessee registration A7267Y owned by [the Petitioner] and all of its contents including any and all electronic devices, currently being stored at the Bradley County Sheriff's Office[.]" Based on the warrant, the sheriff's department transported the car back to the Petitioner's residence and conducted the temperature study on July 3. At the post-conviction evidentiary hearing, trial counsel testified that he did not file a motion to suppress the results of the temperature study because the car was the instrumentality of the crime; therefore, the police did not need a search warrant to conduct the study. Trial counsel also stated that he did not think the temperature study constituted a "search." The post-conviction court found that while trial counsel "probably" should have filed a motion to suppress, the temperature study was not a search. Thus, the police did not need a warrant for the temperature study.

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Tennessee Constitution provide protection for citizens against "unreasonable searches and seizures." Generally, absent a few narrowly defined exceptions, a search

must be conducted according to a valid search warrant to be reasonable. See State v. Brown, 294 S.W.3d 553, 561 (Tenn. 2009).

In support of her claim that the movement of the car and subsequent temperature study constituted a search that exceeded the scope of the search warrant, the Petitioner relies, as she did at the post-conviction evidentiary hearing, on United States v. Jones. In that case, law enforcement installed a GPS tracking device on a vehicle and monitored the vehicle's movements for twenty-eight days. Jones, 565 U.S. at 949. The government later used evidence obtained from the GPS device to connect the defendant to a cocaine "stash" house. Id. The United States Supreme Court held that the installation and monitoring of the device constituted a "search" under the Fourth Amendment and, therefore, required a warrant. As the court explained,

> It is important to be clear about what occurred in this case: The Government physically occupied private property for the purpose of obtaining information. We have no doubt that such a physical intrusion would have been considered a "search" within the meaning of the Fourth Amendment when it was adopted.

Id. However, we agree with the post-conviction court that Jones is quite distinguishable from the present case in that the "information" obtained in Jones was the defendant's movements during an ongoing crime.

In this case, R.B. died on June 28, and L.B. died on the afternoon of June 29. Investigator Scoggins testified that on the evening of June 29, the Petitioner told him that she found the victims in her car. According to Investigator Scoggins' July 2 affidavit in support of the search warrant, the car was searched pursuant to consent on June 29. Crime Scene Investigator Monica Datz testified at trial that she "started examining the vehicle for evidence" on the evening of June 29 and that her examination included testing the car's exterior and interior door handles. According to her report, the car was later transported to the sheriff's department's impound lot. Trial counsel testified that the police had probable cause to believe the victims died of hyperthermia in the car. We note that Robin Flores, the Petitioner's own expert, repeatedly referred to the car as the "weapon." The post-conviction court found that the car was in the sheriff's department's custody at the time of the heat study, and the evidence does not preponderate against the finding of the post-conviction court.

Law enforcement can seize a vehicle that was the instrumentality of the crime. See State v. Donald Curtis Reid, No. M1999-00058-CCA-R3-CD, 2000 WL 502678, at *7 (Tenn. Crim. App. at Nashville, Apr. 28, 2000); State v. Arthur B. Harbin, Jr., No. C.C.A. No. 60, 1990 WL 126729, at *1 (Tenn. Crim. App. at Jackson, Sept. 5, 1990).

Moreover, a subsequent inspection of the vehicle is not an unlawful search. Arthur B. Harbin, Jr., C.C.A. No. 60, 1990 WL 126729, at *1; see People v. Teale, 450 P.2d 564, 570 (Cal. 1969) (stating that "it is plainly in the realm of police investigation to subject objects that have been properly seized[, including automobiles,] to scientific testing and examination"); People v. William Earl Sorrell, 363 N.W.2d 18, 19 (Mich. Ct. App. 1984) (officers, who lawfully seized automobile as an instrumentality of the crime, could conduct tests on the vehicle); State v. Lewis, 258 N.E.2d 445, 449 (Ohio 1970) (providing that "[s]ince the seized car was an instrumentality used in the crime, the authorities had as much right to examine it as they would to examine a weapon claimed to have been used in the commission of a crime"). In fact, police officers "routinely and properly conduct testing of items taken into evidence." State v. Shannon A. Holladay, No. E2004-02858-CCA-R3-CD, 2006 WL 304685, at *7 (Tenn. Crim. App. at Knoxville, Feb. 8, 2006) (J. Wade, concurring). Thus, we conclude that the Petitioner has failed to show that trial counsel was deficient for failing to file a motion to suppress the temperature study.

## B. Home Search Warrant

The Petitioner claims that trial counsel was ineffective by failing to file a motion to suppress the methamphetamine and ion scan evidence obtained from the July 13 search of her home. She contends that the affidavit submitted in support of the search warrant contained stale information from informants and failed to establish probable cause that evidence of manufacturing methamphetamine would be found in the residence at the time of the search. The State argues that the information was not stale and that the affidavit established probable cause for the search warrant; therefore, a motion to suppress the evidence would have been unsuccessful. We conclude that trial counsel was deficient but that the Petitioner has failed to demonstrate prejudice.

On July 13, 2012, Investigator Scoggins submitted an affidavit in support of a search warrant for the Petitioner's home. The affidavit stated that probable cause existed to believe the house contained evidence of the Petitioner's drug use and manufacturing methamphetamine and listed eleven paragraphs as bases for probable cause. The Petitioner takes issue with the following paragraphs:

> h) On Monday July 9, 2012 Mr. Preston Woods was interviewed due to information received that he was with the mother Tasha Moses Bates the night before the children died. Mr. Woods told your affiant that he observed Tasha Moses Bates "Geeking" and using marijuana that night at her home. Mr. Woods also states that both children were present while he was there. He stated that Tasha Moses then drove him home in her green Toyota Corolla.

- 22 -

i) On Tuesday July 10, 2012, Terry and Rachel Murphy told [your] affiant that they were at the home of Tasha Moses two nights before the children died and that Marijuana was being smoked by all parties present including Tasha Bates. They also stated that at least one of Ms. Bates children was present.

j) On Wednesday July, 11, 2012, Mr. Robert Keith Taylor told your affiant that on the day of the children's funeral he was party to a conversation between Scott Rouse and Robert Edward Hamilton. During this conversation Mr. Hamilton asked Mr. Rouse if had gotten all of the garbage cleaned up before the police arrived. Mr. Taylor stated that they were taking about garbage from methamphetamine production which apparently occurred at the home where the children died and now the subject of this request to search. Additionally, Mr. Rouse had given a statement to your affiant and Det. Kevin White on July 3, 2012 admitting that he smoked marijuana with Tasha Moses.

k) Now that it is known that drug use and manufacturing likely occurred at the home where the children died . . . and that the mother in charge of their health and welfare may have been under the influence of drugs or manufacturing drugs while the children were present your affiant is requesting authorization to search again for this reason. Additionally, a specific technique known as Ionspectrometry used with a device called an IonScan will be used to test trace amounts of narcotics for drug residue which is normally left on surfaces where the manufacturing of drugs and use of drugs occur.

Based on the information contained in the affidavit, a search warrant for the Petitioner's home was issued and executed on July 13, 2012. During the search, police officers searched a dumpster that was near the home's garage. Two plastic bags in the dumpster contained items used to manufacture methamphetamine and items linking the Petitioner to the bags. Specifically, one of the bags contained a civil warrant issued to the Petitioner, and the other bag contained a checkbook with the Petitioner's name on it. The police searched the Petitioner's garage and found additional garbage bags containing items used to manufacture methamphetamine. One of the bags contained a torn photograph of the Petitioner, and a second bag contained photographs of a small child who looked like one of the victims. James Derry's ion scan machine detected methamphetamine on a piece of aluminum foil found in the garage.

Our supreme court has stated that

[t]he Fourth Amendment to the United States Constitution requires that search warrants issue only "upon probable cause, supported by Oath or affirmation." Article I, Section 7 of the Tennessee Constitution precludes the issuance of warrants except upon "evidence of the fact committed." Therefore, under both the federal and state constitutions, no warrant is to be issued except upon probable cause. Probable cause has been defined as a reasonable ground for suspicion, supported by circumstances indicative of an illegal act.

Henning, 975 S.W.2d at 294 (footnote and citations omitted). "[A] finding of probable cause supporting issuance of a search warrant must be based upon evidence included in a written and sworn affidavit." Id. In examining the affidavit, this court's standard of review is limited to whether the issuing magistrate had "'a substantial basis for concluding that a search warrant would uncover evidence of wrongdoing.'" State v. Tuttle, 515 S.W.3d 282, 299 (Tenn. 2017 (quoting State v. Jacumin, 778 S.W.2d 430, 432 (Tenn. 1989)). We note that "'affidavits must be looked at and read in a commonsense and practical manner', and . . . the finding of probable cause by the issuing magistrate is entitled to great deference." State v. Bryan, 769 S.W.2d 208, 211 (Tenn. 1989) (quoting State v. Melson, 638 S.W.2d 342, 357 (Tenn. 1982)).

Regarding staleness, our supreme court has explained,

"The time of the occurrence of the facts relied upon by the affiant is . . . a prime element in establishing probable cause for the issuance of a search warrant. If the information contained in the affidavit is too old, it is considered stale" and will be insufficient to establish probable cause. W. Mark Ward, Tennessee Criminal Trial Practice, § 4.11 (2016-17 ed.) . . . ; see also Everett v. State, 184 S.W.2d 43, 45 (1944); Welchance v. State, 114 S.W.2d 781, 782 (1938). Nevertheless, there is no hard and fast rule defining staleness, and "[w]hen the illegal activity described is ongoing, courts have generally held that [an] affidavit does not become stale with the passage of time." State v. Thomas, 818 S.W.2d 350, 357 (Tenn. Crim. App. 1991); see also State v. Norris, 47 S.W.3d 457, 470-71 (Tenn. Crim. App. 2000); State v. McCary, 119 S.W.3d 226, 249 (Tenn. Crim. App. 2003).

State v. Tuttle, 515 S.W.3d 282, 301 (Tenn. 2017).

Turning to the instant case, Investigator Scoggins' affidavit included information obtained regarding the Petitioner's drug use near the time of the victims' deaths, which

was just two weeks prior to the search. Moreover, Investigator Scoggins obtained the information on July 9 through 11, just days before he submitted the affidavit in support of the warrant. Therefore, we conclude that the information was not stale and that the affidavit established probable cause to believe that the Petitioner was using illegal drugs in her home.

That said, the only basis for believing that the Petitioner was manufacturing methamphetamine in her home came from the Investigator Scoggins' brief assertion in his affidavit that Robert Taylor told him on July 11, 2012, that Taylor heard a conversation between Scott Rouse and Robert Hamilton in which Hamilton asked Rouse if Rouse "had gotten all of the garbage cleaned up before the police arrived." Taylor told Investigator Scoggins that Rouse and Hamilton were talking about garbage from methamphetamine production inside the residence. We agree with the Petitioner that the information in the affidavit did not establish probable cause to believe that evidence of manufacturing methamphetamine would still be in the home at the time of the search. Therefore, trial counsel was deficient for failing to file a motion to suppress any evidence related to the manufacture of methamphetamine, and we turn to whether the Petitioner was prejudiced by the deficiency.

The State's theory at trial with regard to the felony murder and aggravated child neglect convictions was that the victims died due to their being trapped in the Petitioner's hot car while she was sleeping and that she was sleeping due to her use of methamphetamine. On direct appeal of her convictions to this court, this court summarized the evidence and explained why it was sufficient to support the convictions:

> Investigator Scoggins testified that the defendant changed her explanation several times as to what the victims had been doing while outside the morning of their deaths. Among other statements, she first said that they had been playing the yard but later said it was "possible" they had been under the front porch. When told of the results of the autopsies of the victims, she said the victims had been beside the motor vehicle but later admitted she had found the younger victim, R.B., in the right front passenger seat of the vehicle and L.B. "partially hanging out of the right rear passenger door." The defendant and other witnesses, as we have set out, testified that the victims liked to play in the car.

> The State presented testimony that the defendant tested positive for methamphetamine when she was tested shortly after the bodies of the victims had been discovered. This drug makes the user sleepy. Additionally, the evidence showed that the victims liked to play in the defendant's car and that on the day of their deaths the temperature was over

100 degrees. The State presented testimony that, because of the broken interior door handles, it was difficult, if not impossible, to open the doors from the inside [of] the car. Meteorologist Jan Null testified that the temperature inside the vehicle would have been about 45 degrees higher than the outside temperature, which was 101 degrees on the day of the victims' deaths. Upon being questioned about the deaths, the defendant gave conflicting statements as to how long the victims had been unsupervised and where she had discovered their bodies. Instead of immediately going to a neighbor's to seek help, the defendant, instead, drove the victims to her father's house, delaying the arrival of emergency medical personnel. Medical experts testified that the core temperature of the victims could not have been so high unless they had been in the defendant's car.

From all of this proof, a reasonable jury could have concluded that the defendant was sleeping, as a result of her use of methamphetamine, while the victims were in the yard, unsupervised, for an unknown period of time. The defendant knew that the victims liked to play in the car, that the day was hot, and that the car doors could not be opened by the children from the inside of the vehicle. Further, a reasonable jury could have concluded that, to mask her responsibility, the defendant gave conflicting versions as to what had occurred and how she had found the victims. Thus, the evidence is sufficient to sustain the defendant's convictions for felony murder and aggravated child neglect.

Natasha Moses Bates, No. E2014-00725-CCA-R3-CD, 2015 WL 1593657, at *7. In addressing whether the trial court erred by failing to sever the drug offenses from the felony murder and aggravated child neglect offenses, this court noted that "the State presented no proof that the defendant was inattentive because, as the victims were trapped and dying, she was facilitating to initiate a process to manufacture methamphetamine or purchasing ingredients to do so." Id. at *9. Thus, we conclude that the Petitioner has failed to show that trial counsel's failure to file a motion to suppress evidence of manufacturing methamphetamine would have changed the outcome of her trial.

In a related argument, the Petitioner contends that trial counsel's failure to file a motion to suppress evidence of manufacturing methamphetamine was highly prejudicial to her at sentencing because the trial court relied on the evidence to order consecutive sentencing as a dangerous offender. According to the Petitioner, "the trial court expressed outrage over the conditions the victims were living in. That conclusion had to come from the photographs obtained in the July 13, 2012 search." We disagree with the

Petitioner. Investigator Monica Datz testified at trial that on June 28, 2012, she took photographs inside the Petitioner's home. Investigator Datz testified about the photographs, and the State introduced them into evidence. We have reviewed the photographs, and they show that the victims were living in deplorable conditions with piles of debris and trash all over the floor in every room, heavily stained mattresses with no sheets in the bedrooms, a cluttered kitchen counter with dirty dishes piled in the kitchen sink and a stovetop with food stains on it, and bathroom sinks containing dirt and trash. Moreover, this court addressed consecutive sentencing in the Petitioner's direct appeal of her convictions. Despite this court's finding that the trial court erred by not severing the drug offenses from the felony murder and aggravated child neglect offenses, this court upheld consecutive sentencing for the felony murder convictions, stating, "Because the defendant in the present appeal, at a minimum, demonstrated extreme callousness toward the health and welfare of the victims, and the results were fatal, the trial court, in our view, had a reasonable basis for imposing consecutive sentences." Therefore, we again conclude that the Petitioner has failed to demonstrate prejudice.

C. Witness Testimony

The Petitioner contends that she received the ineffective assistance of counsel because trial counsel failed to "object to the testimony of witnesses who clearly were not qualified to testify about the subject matter they were asked to testify about, some of whom acknowledged that lack of qualification." Specifically, the Petitioner contends that Investigator Scoggins should not have been allowed to testify about items used in the manufacture of methamphetamine when he admitted he was not qualified to do so; that Detective Arthur should not have been allowed to testify about how to cook methamphetamine when he admitted he was not qualified to testify about the subject; that Agent Carlisle, who testified as an expert in toxicology and blood testing, should not have been allowed to testify about the effects of methamphetamine on the human body; that James Derry, who was certified to operate the ion scanner, should not have been allowed to testify about the manufacture of methamphetamine; and that Patrick Vasterling, a social worker, should not have been allowed to testify about the results of the Petitioner's urine test. The Petitioner also contends that trial counsel was ineffective during his direct examination of her because he accused her of lying. The State argues that counsel was not ineffective. We agree with the State.

We have carefully reviewed the testimony of Investigator Scoggins and Detective Arthur. Investigator Scoggins testified that he was "not as well versed" in the production of methamphetamine as some officers, and Detective Arthur testified that he was not an "expert" in the manufacture of methamphetamine. However, neither officer said he was not qualified to testify about the process of manufacturing methamphetamine. In fact, Detective Arthur testified that he had assisted with the investigation of "at least 200"

methamphetamine laboratories. Therefore, we find no merit to the Petitioner's claim that trial counsel was ineffective by failing to object to their testimony on the basis that they were not qualified to testify.

As to Agent Carlisle's testimony, the witness testified as a toxicology expert, and the Petitioner offered no proof at the evidentiary hearing that Agent Carlisle was not qualified to testify about the effects of methamphetamine on the human body. Likewise, the Petitioner offered no proof that James Derry was not qualified to testify about the process to manufacture methamphetamine. We note that Derry testified at trial that he had worked for the Tennessee Meth and Pharmaceutical Task Force since 2004. Finally, the Petitioner offered no proof at the hearing to show that Patrick Vasterling was not qualified to testify about the urine test. In any event, given that the Petitioner's blood test also showed she had used methamphetamine, the Petitioner has failed to demonstrate prejudice.

Regarding trial counsel's direct examination of the Petitioner at trial, trial counsel testified that although he may have been "hard" on the Petitioner, he was trying to get "some real emotion" from her. The post-conviction court found that trial counsel's method of questioning the Petitioner was part of his trial strategy. This court has stated that "[w]hen reviewing trial counsel's actions, this court should not use the benefit of hindsight to second-guess trial strategy and criticize counsel's tactics." Irick v. State, 973 S.W.2d 643, 652 (Tenn. Crim. App. 1998). In any event, we have reviewed the Petitioner's testimony and see nothing improper in trial counsel's questioning of the Petitioner. Although trial counsel was accusatory at times, the Petitioner fails to acknowledge the difficult position in which she put trial counsel. The Petitioner first told Investigator Scoggins that she found the victims in the yard but then told him she found the victims in the car. At trial, she testified that she found the victims in the yard, which totally contradicted the State's proof. Accordingly, we agree with the post-conviction court that trial counsel was not ineffective.

## III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the post-conviction court.

_____
NORMA MCGEE OGLE, JUDGE

- 28 -